T.C. Memo. 1997-166

UNITED STATES TAX COURT

NATHAN P. AND GERALDINE V. MORTON, Petitioners <u>v</u>.
  COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26651-93.                    Filed April 1, 1997.

<u>James L. Kissire</u> and <u>Bob J. Shelton</u>, for petitioners.

<u>John Repsis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following deficiency in, and penalty on, petitioners' Federal income tax for 1989:

| <u>Deficiency</u> | <u>Sec. 6662 Penalty</u> |
|---|---|
| $296,702 | $59,340 |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect for 1989. After concessions, the issues remaining for decision are: (1) Whether the fair market value of the capital stock of Soft Warehouse, Inc. ("SWI"), on June 30, 1989, was $60.98 per share as petitioners contend, or $1,739.82 per share as determined by respondent; and (2) whether petitioners are liable for the accuracy-related penalty prescribed by section 6662(a).

## Respondent's Motion in Limine

As a preliminary matter, we must decide respondent's motion in limine wherein she asks the Court to overrule certain evidentiary objections reserved by petitioners in the stipulation of facts. Petitioners object to the admission of the following joint exhibits:

1. A memorandum prepared by Dubin Clark & Co., Inc. ("Dubin Clark"), describing its 1989 purchase of SWI;

2. A memorandum prepared by Continental Illinois National Bank and Trust Co. of Chicago ("Continental Bank") for the purpose of approving financing for Dubin Clark's purchase and subsequent expansion of SWI;

3. A valuation of a noncontrolling equity interest in SWI as of March 31, 1990, prepared by KPMG Peat Marwick and dated June 14, 1990;

4. A confidential private placement memorandum dated October 1, 1990, prepared by Goldman, Sachs & Co. and Alex. Brown & Sons, Inc.; and

5. A prospectus for CompUSA (the successor company of SWI) dated December 17, 1991, prepared by Kidder, Peabody & Co., Inc., and the First Boston Corp.

Petitioners argue that these documents are irrelevant to our determination of the value of SWI stock as of June 30, 1989, insofar as they relate to events or conditions arising after that date. Petitioners maintain that only events or conditions which are reasonably foreseeable to a hypothetical buyer and seller on the valuation date can be considered in determining the value of the subject property on that date. Petitioners also argue that even if the documents are relevant, they should not be admitted into evidence because they create an undue risk of prejudice and confusion of the issues which outweighs their probative value. Respondent, on the other hand, contends that the documents are relevant because they represent subsequent evidence of the value of SWI stock on the valuation date. Respondent points out that all of the documents were drafted by disinterested third parties incident to a sale or issuance of SWI stock, and that they were drafted for purposes other than litigation.

Respondent also maintains that the documents do not create an undue risk of prejudice.

The primary issue in this case is the fair market value of SWI stock as of June 30, 1989. Fair market value is generally defined as the price at which property would change hands between a willing buyer and a willing seller on a fixed date, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts. See sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Krapf v. United States, 977 F.2d 1454, 1457 (Fed. Cir. 1992); Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo. 1982-440; Estate of Brown v. Commissioner, 425 F.2d 1406, 1406-1407 (5th Cir. 1970), affg. T.C. Memo. 1969-91; Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus. v. Commissioner, 73 T.C. 266, 276 (1979); Culp v. Commissioner, T.C. Memo. 1989-517 (applying this standard to section 83(b) election).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. We agree with petitioners that unforeseeable events occurring after the hypothetical date of sale which alter

the value of the property should not be considered in fixing fair market value. See First Natl. Bank of Kenosha v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985). However, this Court has drawn a distinction between subsequent events which affect the value of the property and those which merely provide evidence of such value on the valuation date. See Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993).

Subsequent events or conditions which affect the value of the property can be taken into account only if they are reasonably foreseeable on the valuation date. Id. For example, the discovery of oil on real property after the valuation date could affect what a willing buyer would pay and what a willing seller would demand for the property on the valuation date if the buyer and seller could foresee the discovery. If the discovery was unforeseeable on the valuation date, then it could not affect the value of the property on the valuation date and should not be considered in determining the value of the property on that date. See id.; Estate of Hillebrandt v. Commissioner, T.C. Memo. 1986-560.

Conversely, subsequent events which merely provide evidence of the value of the property on the valuation date can be taken into account regardless whether they are foreseeable on the valuation date. See id. Estate of

Jung v. Commissioner, supra.  In considering such events,
appropriate adjustments must be made for changes in
inflation, general economic conditions in the industry,
technological advances, and similar factors.  Id.  For
example, a subsequent arm's-length sale of the property
appropriately adjusted to take account of general economic
differences between the valuation date and the date of the
sale is relevant because it provides evidence of the value
of the property on the valuation date.  See id. at 431-432.
Indeed, this and other courts have recognized on many
occasions that:

> In determining the value of unlisted stocks,
> actual sales made in reasonable amounts at arm's
> length, in the normal course of business within
> a reasonable time before or after the valuation
> date are the best criteria of market value.
> [Duncan Indus. v. Commissioner, 73 T.C. 266, 276
> (1979) (citing Fitts' Estate v. Commissioner, 237
> F.2d 729 (8th Cir. 1956), affg. T.C. Memo. 1955-
> 269.  See also Estate of Jung v. Commissioner,
> supra; Estate of Andrews v. Commissioner, 79
> T.C. 938, 940 (1982); Estate of Campbell v.
> Commissioner, T.C. Memo. 1991-615.]

In light of the foregoing, we find that each of the
items at issue except for the CompUSA prospectus is
relevant to our determination of the value of SWI stock as
of June 30, 1989.  The Dubin Clark memorandum describing
the terms of its purchase of SWI (item number 1 above) and
the memorandum prepared by Continental Bank for purposes

of approving financing for that transaction (item number 2 above) were both prepared prior to the valuation date. Both documents were prepared in connection with Dubin Clark's purchase of SWI, and neither describes subsequent events which affected the value of the stock. Accordingly, these documents are directly relevant to our determination of the value of SWI stock on the valuation date. See Estate of Jung v. Commissioner, supra.

The valuation of a noncontrolling equity interest in SWI prepared by KPMG Peat Marwick (item number 3 above) and the confidential private placement memorandum prepared by Goldman, Sachs & Co. and Alex. Brown & Sons, Inc. (item number 4 above), were both prepared after the valuation date. However, both of these documents contain information regarding the value of SWI stock within a reasonable time after that date, and neither describes subsequent events which affected the value of SWI stock. Both documents also represent valuations of SWI stock by third parties who were not influenced by the biases of litigation. The fact that they were prepared after the valuation date is a factor that we must consider in determining the probative value of the evidence, but does not automatically make the documents irrelevant. See Krapf v. United States, 977 F.2d 1454, 1458-1459 (Fed. Cir. 1992).

The CompUSA prospectus (item number 5 above), on the other hand, is not relevant to our determination of the value of the stock at issue. This document describes a public offering of SWI stock almost 2-1/2 years after the valuation date. Based upon the record of this case, we cannot find that the public offering was sufficiently foreseeable by the parties on the valuation date. Accordingly, we will sustain petitioners' objection insofar as the CompUSA prospectus is concerned.

We reject petitioners' argument that the items in question should not be admitted into evidence because Estate of Jung v. Commissioner, supra, and similar cases only allow consideration of subsequent arm's-length sales of the subject property. As noted above, the first two items describe conditions existing prior to the valuation date. Assuming that petitioners' restrictive reading of Estate of Jung v. Commissioner, supra, is correct, the next two items fit comfortably within that reading. The confidential private placement memorandum (item number 4) was in fact prepared in connection with an arm's-length sale of SWI stock. Similarly, the valuation of a noncontrolling equity interest in SWI (item number 3) was requested by the board of directors to ascertain the price at which SWI stock would change hands in an arm's-length sale. Accordingly, we find that these documents are

essentially indistinguishable from the events which were determined to be relevant in Estate of Jung v. Commissioner, supra.

We also find that the documents in question do not create an undue risk of prejudice or confusion of the issues. A court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Petitioners do not point to any specific facts which indicate that the evidence at issue would create an undue risk of prejudice or confusion of the issues if admitted. Rather, petitioners merely state that "Respondent's documents would unduly prejudice Petitioners and confuse the issues and should not be considered by this Court in determining the value of the subject stock." We find petitioners' conclusory statement in this regard both unsupported and unpersuasive. The documents at issue are highly probative and do not, in our estimation, create an undue risk of prejudice or confusion of the issues. Accordingly, we shall grant respondent's motion in limine and overrule petitioners' objections to the admission of the first four items listed above into evidence. We shall overrule respondent's motion in limine and sustain

petitioner's objection to the admission of the CompUSA prospectus (item 5) into evidence.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, stipulation of settled issues, and exhibits attached to each are incorporated herein by this reference. At the time they filed their petition in this case, petitioners resided in Dallas, Texas. References to petitioner in this opinion are to Mr. Nathan P. Morton.

Petitioner is a business executive who specializes in retail marketing. Prior to May 1989, he was senior vice president of operations for Home Depot, Inc., a retailer specializing in hardware and housewares. When petitioner joined Home Depot in 1984, it operated 21 stores. When he resigned in 1989, Home Depot had grown to approximately 100 stores.

SWI was formed in 1984 by Messrs. Errol Jacobson and Michael Henochowicz. SWI sold computer hardware and software through warehouse "superstore" outlets, by mail, and through direct telemarketing. By January of 1989, SWI was operating two stores, one in Dallas, Texas, and one in Norcross, Georgia, and was planning to open more. Messrs. Jacobson and Henochowicz believed that SWI could become a

dominant force in its market and wanted to expand the company. Although their corporate contacts and experience in retail sales and distribution provided a significant benefit to SWI, Messrs. Jacobson and Henochowicz were both aware that they lacked the experience and capital necessary to expand the company. Accordingly, Messrs. Jacobson and Henochowicz sold their SWI stock to Dubin Clark in January 1989, although they continued working for the company after Dubin Clark's acquisition.

Dubin Clark's purchase of SWI was structured as a stock purchase followed by a merger. Old SWI was merged into new SWI, and new SWI was the surviving entity. In exchange for their stock in old SWI, the selling share-holders were to receive a total of $5 million in cash, the right to purchase approximately 27 percent of the stock of new SWI for $60.98 per share, and contingent annual cash payments for 5 years following the sale equal to 30 percent of the company's operating profit in excess of $4 million per year. One-half of the contingent payments was designated as "incentive compensation" to insure the continuing involvement of the selling shareholders in the management of SWI. The other half was designated as "earn-out" payments.

SWI calculated the $60.98 price per share that the former owners paid for the stock of new SWI by dividing

paid-in capital by the number of shares outstanding after the acquisition (i.e., paid-in capital as of January 31, 1989, $439,056, divided by total shares outstanding on the same date, 7,200). The cash portion of the purchase price was paid with retained earnings from old SWI and the proceeds of debt incurred by new SWI. Prior to the Dubin Clark purchase, SWI had virtually no long-term debt. After the buyout, SWI had approximately $5 million in outstanding debt.

The Dubin Clark purchase was completed on January 31, 1989. Messrs. Jacobson and Henochowicz received a total of $279,000 in contingent payments based upon operating income for the fiscal year ended on June 30, 1990. In January 1991, SWI repurchased 1,423,787 of the shares held by Messrs. Jacobson and Henochowicz for $4,416,000 in cash. SWI also purchased Messrs. Jacobson's and Henochowicz's rights to future contingent payments for a total of $4,098,000 in cash.

Dubin Clark was a sophisticated investor with a proven record of successfully managing the growth of its acquisitions. After acquiring SWI, Dubin Clark implemented a plan to expand the company. Dubin Clark's original plan was to open one or two new stores per year and become dominant in certain regional markets. This would have allowed Dubin Clark to withdraw excess cash from the

business over the time it managed the company.  Dubin Clark intended to take SWI public when sales reached $250 to $300 million, which they expected to take about 3 years.

An important aspect of Dubin Clark's plan to expand SWI was hiring experienced management.  In accordance with this aspect of its plan, SWI approached petitioner in March 1989 and offered him a position overseeing the company's expansion.  Dubin Clark believed that petitioner's expertise in assembling management teams, building corporate infrastructure, and establishing plans to facilitate corporate growth was essential to its plan to expand SWI.

Petitioner originally rejected Dubin Clark's offer because he did not agree with its plan to make SWI a dominant regional retailer.  Rather, petitioner believed that SWI would be most competitive if it expanded into a variety of geographical markets.  Dubin Clark eventually agreed with petitioner's assessment and offered him the position of president and chief operating officer of SWI.

Petitioner accepted Dubin Clark's offer in April 1989, but did not join the company immediately because he had previously committed to assist Home Depot in a debt offering.  Although he provided consulting services for a short time before his actual starting date and attended the opening of SWI's third store in Houston, Texas in April,

petitioner did not officially begin working for SWI until May 31, 1989. Because of his outstanding business credentials, petitioner's employment with SWI increased the value of SWI stock almost immediately.

Dubin Clark realized that to attract desirable managers to SWI, it needed to offer management candidates ownership interests in the company. Therefore, on June 1, 1989, SWI's board of directors adopted a "Share Compensation Plan" (hereinafter referred to as the stock plan). This stock plan authorized the board of directors to allow employees to purchase stock in SWI at a predetermined price. The stock plan did not require that the stock be sold at fair market value. In fact, Dubin Clark contemplated that most of the shares would be sold for less than fair market value. Under the terms of the stock plan, the price was originally set at $60.98 per share, and SWI's board of directors was authorized to make subsequent adjustments to this price. Although the stock plan provided that the price could not violate applicable State law, it provided no other specific criteria for making these adjustments. No valuation of SWI's stock was made at the time the stock plan was adopted. At this time, it appears that there were 7,100 shares of SWI capital stock outstanding, and an additional 1,800 stock purchase warrants held by two lending institutions.

Petitioner believed that leaving a secure position with Home Depot to join SWI was a risky move, and he would not have joined SWI without obtaining a significant equity interest in the company. On July 13, 1989, after some negotiation concerning the amount of stock petitioner would receive pursuant to the stock plan, he and Dubin Clark entered into a "Stock Purchase Agreement" (hereinafter referred to as the agreement) under which petitioner agreed to purchase 500 shares of SWI stock for $60.98 per share. This is the same price that Messrs. Jacobson and Henochowicz paid for their shares, and is the initial price established under the stock plan. Neither SWI nor petitioner obtained an independent valuation of the stock prior to or at the time of this purchase. Petitioner believed that the shares were fairly valuable and would have purchased more if he had been given the opportunity.

The stock petitioner purchased pursuant to the agreement was subject to certain restrictions. Petitioner could not sell, assign, transfer, pledge, or dispose of the stock to any person or entity other than SWI. In addition, all of the shares were initially "unvested". However, 20 percent of the shares received were to become vested on the anniversary of the purchase each year, so that all of the shares would be vested 5 years from the date of sale. The agreement also required SWI to repurchase all of

petitioner's shares within 90 days of any termination of employment other than a voluntary termination by petitioner. The repurchase price for vested shares was equal to the adjusted book value per share. The price for the unvested shares was set at the lesser of the adjusted book value per share or the original purchase price.

On or before August 12, 1989, petitioners filed with the Internal Revenue Service a timely election under section 83(b) regarding the SWI stock petitioner purchased pursuant to the agreement. In this election, petitioners reported the fair market value of the SWI stock to be $60.98 per share, the amount petitioner paid for the stock. Thus, petitioners claimed that they realized no gross income in 1989 from the purchase of the SWI shares. Although petitioner received the subject stock on July 13, 1989, the parties agree that June 30, 1989, is the appropriate valuation date with regard to the section 83(b) election.

SWI experienced moderate expansion during the first half of 1989. Although it began the year with only two superstores, it opened a third in Houston, Texas, in April, and was preparing to open a fourth in Los Angeles by the end of June. In addition, its most successful store, located in Dallas, had to be moved several times into larger facilities. Although the company was beginning to

recruit experienced managers, petitioner was the only new manager hired as of June 30, 1989.  SWI was generally financially healthy at this time, but it had some fiscal concerns, including the significant amount of debt assumed to finance the buyout and expansion.  As of June 30, 1989, SWI had long term debt of approximately $8.3 million and current liabilities of approximately $13.2 million.  SWI's balance sheet as of June 30, 1989 was as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| | | Current liabilities | |
| | | Accounts payable | $11,290,720 |
| Current assets | | Accrued liabilities | 1,502,966 |
| Cash and equivalents | $1,745,901 | Income taxes payable | 259,550 |
| Net accounts receivable | 6,730,874 | Current portion of | |
| Inventory | 9,554,926 | capital lease obligations | 158,040 |
| Prepaid Expenses | 555,899 | Total | 13,211,276 |
| Total | 18,587,600 | | |
| | | Capital lease obligations | 326,255 |
| Property and equipment, at cost | | | |
| Furniture, fixtures and | | Bank credit agreement | 3,070,462 |
| equipment | 738,733 | | |
| Leasehold improvements | 392,462 | Senior subordinated notes | 4,912,341 |
| Property under capital lease | 634,268 | Total long-term liabilities | 8,309,058 |
| Capital projects in progress | 35,633 | Total liabilities  99.81% | 21,520,334 |
| Less accumulated depreciation | (367,558) | | |
| Net property & equipment | 1,433,538 | Shareholders' Equity | |
| Net intangible assets & deferred charges, net | 1,432,104 | Warrants | 125,526 |
| | | Common stock | 71 |
| Deposits and other | 108,583 | Additional paid in capital | 430,693 |
| total assets | 21,561,825 | Retained Earnings | 109,674 |
| | | Total | 666,054 |
| | | Carryover basis adjustment | (624,563) |
| | | Total shareholders' equity 0.19% | 41,491 |
| | | Liabilities + Shareholders' equity | 21,561,825 |

In the 5-month period ending on June 30, 1989, SWI experienced total sales of $64 million, gross profit of $16.9 million, and net income of $125,526.  During this same period, SWI's gross profit margin decreased from 12.8

percent to 11.2 percent.  SWI's future financial performance was expected to be impacted by the approximately $1 million in capital expenditures necessary to open each new store, and the annual management fee that SWI was required to pay Dubin Clark.  On June 30, 1989, SWI had 7,100 shares of capital stock outstanding.  As mentioned above, an additional 1,800 stock purchase warrants were held by two lending institutions.

SWI's growth is evidenced by its income statements for the fiscal years 1987, 1988, and 1989, which are set out below:

| Fiscal Year Ending 6/30 | 1987 | 1988 | 1989 |
|---|---|---|---|
| Net sales | $32,124,000 | $66,566,000 | $137,457,598 |
| Cost of sales | 29,450,000 | 58,072,000 | 122,016,440 |
| Gross profit | 2,674,000 | 8,494,000 | 15,441,158 |
| Selling, general and administrative expenses | | | |
| Salaries and employee benefits | | | 11,812,357 |
| Advertising | 1,223,000 | 2,890,000 | |
| Rent | 488,000 | 1,503,000 | |
| Other expenses | 107,000 | 199,000 | |
| Depreciation and amortization | 357,000 | 857,000 | |
| Total | 8,000 | 89,000 | 370,170 |
| | 2,183,000 | 5,538,000 | 12,182,527 |
| Operating income | | | |
| | 491,000 | 2,956,000 | 3,258,631 |
| Other income/expense | | | |
| Interest income | | | |
| Other income | 6,000 | 45,000 | 53,391 |
| Interest expense | 5,000 | 26,000 | 33,729 |
| Total | (3,000) | (11,000) | (454,939) |
| | 8,000 | 60,000 | (367,819) |
| Earnings before income taxes | | | |
| | 499,000 | 3,016,000 | 2,890,812 |
| Income taxes | | | |
| Current | | | |
| Deferred | 213,000 | 1,087,000 | 1,204,472 |
| Total | 5,000 | (15,000) | -- |
| | 218,000 | 1,072,000 | 1,204,472 |
| Net income | | | |
| | 281,000 | 1,944,000 | 1,686,340 |

The above figures for 1987 and 1988 are taken from an audited statement attached to a memorandum prepared by Dubin Clark describing its 1989 purchase of SWI.  The figures for 1989 are a combination of old SWI's figures and new SWI's figures.

On April 16, 1990, petitioners filed an application for an automatic extension of time to file their individual return for 1989 and paid the estimated tax due. On August 14, 1990, petitioners requested an additional extension of time to file their return until September 25, 1990. Respondent granted this extension application on August 30, 1990. Petitioners' Form 1040, U.S. Individual Income Tax Return, was signed on October 15, 1990, and stamped received by respondent's Austin, Texas, Service Center on October 22, 1990. We note that respondent did not determine an addition to tax for late filing with respect to petitioners' 1989 return. On their return, petitioners valued their SWI stock for section 83(b) purposes at $60.98 per share. Thus, petitioners did not report any income on their 1989 return with respect to petitioner's purchase of 500 shares of SWI stock.

On April 4, 1990, petitioner purchased an additional 25 shares of SWI stock for $60.98 per share. Petitioners thereafter made a section 83(b) election with respect to these additional shares, in which they reported the fair market value of the stock to be $2,600 per share. This second section 83(b) election is not at issue in this case.

In 1991, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, with respect to their 1989 return. In the amended return, petitioners claim to have overpaid their 1989 income tax due to an accounting error for an S corporation in which petitioners owned shares. This amendment is not at issue in this case.

SWI did not obtain an independent valuation of its stock until June 14, 1990. Petitioner did not personally obtain an appraisal of the subject stock until preparation for trial. SWI stock was not publicly traded at any time during 1989.

OPINION

The principal issue for decision in this case is whether the value of the SWI stock petitioner purchased was greater than the $60.98 per share he paid and reported on his section 83(b) election. Section 83(a) provides generally that the value of property transferred in connection with the performance of services must be included in the gross income of the taxpayer who performs the services. The value of such property is included in income in the first year in which the taxpayer's rights in the property are transferable or are not subject to a substantial risk of forfeiture, whichever is earlier. At such time, the excess of the fair market value of the

property over the amount, if any, that the taxpayer paid for such property is included in the taxpayer's gross income.

Section 83(b) allows a taxpayer to elect to include in gross income in the year of receipt the value of the property transferred in exchange for services regardless of whether his or her rights in the property are transferable or subject to a substantial risk of forfeiture. Section 83(b) provides as follows:

(b) ELECTION TO INCLUDE IN GROSS INCOME IN YEAR OF TRANSFER.--

(1) In General.--Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of--

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

The parties agree that petitioners were eligible to make an election under section 83(b) with regard to their SWI stock.

The sole dispute between the parties to this case is over the fair market value of the stock at the time of the purchase, June 30, 1989. In their section 83(b) election, petitioners claimed that the fair market value of the stock was $60.98 per share, the price petitioner paid for his 500 shares. In the notice of deficiency, respondent determined that the fair market value of the stock was $1,739.82 per share, and that petitioners' 1989 taxable income should therefore be increased in the amount of $839,420 (i.e., $1,739.82 minus $60.98 times 500). In a report prepared for trial, petitioners' expert valued the stock at $55 per share. At trial, respondent's expert testified that the stock was worth $1,798 per share.

Generally, fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.); see also Culp v. Commissioner, T.C. Memo. 1989-517 (applying this standard to a section 83(b) election).

The determination of fair market value is a question of fact to be resolved from a consideration of all relevant evidence in the record and appropriate inferences therefrom.  See Estate of Jung v. Commissioner, 101 T.C. 412, 423-424 (1993); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus. v. Commissioner, 73 T.C. 266, 276 (1979); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).  Petitioners bear the burden of proving that the fair market value determined by respondent is incorrect.  See Rule 142(a), Tax Court Rules of Practice and Procedure; Estate of Jung v. Commissioner, supra at 424; Estate of Winkler v. Commissioner, T.C. Memo. 1989-231.  All Rule references hereinafter are to the Tax Court Rules of Practice and Procedure.

Determining fair market value is often difficult where, as here, the subject property is the capital stock of a closely held corporation for which no public market exists.  In these circumstances, an actual arm's-length sale of the stock in the normal course of business within a reasonable time before or after the valuation date is the best evidence of fair market value.  See Estate of Andrews v. Commissioner, supra at 940; Estate of Campbell v. Commissioner, T.C. Memo. 1991-615, sec. 20.2031-2(b),

Estate Tax Regs.  In the absence of such sales, fair

market value is determined by considering, inter alia:

    (a)  The nature of the business and the history
         of the enterprise from its inception;

    (b)  The economic outlook in general and
         the condition and outlook of the
         specific industry in particular;

    (c)  The book value of the stock and the
         financial condition of the business;

    (d)  The earning capacity of the company;

    (e)  The dividend paying capacity [of the
         company];

    (f)  Whether or not the enterprise has
         goodwill or other intangible value;

    (g)  The size of the block of stock to be
         valued; and

    (h)  The market price of stock of
         corporations engaged in the same line
         or similar line of business having
         their stocks actively traded in a
         free and open market, either on an
         exchange or over-the-counter.  [Rev.
         Rul. 59-60, sec. 4.01, 1959-1 C.B. at
         237, 238-239; see also sec. 20.2031-
         2(f), Estate Tax Regs.]

These factors are not intended to be all-inclusive, and

cannot be applied with mathematical certainty.  See Rev.

Rul. 59-60 sec. 3.01, 1959-1 C.B. at 238.  Because

petitioners made a section 83(b) election with respect

to the subject stock, and because the restrictions on the

stock were not perpetual, the value of the SWI stock for

section 83 purposes must be determined as though the restrictions did not exist.  Sec. 83(b).

There are three generally accepted methods of determining the value of stock:  The market comparison approach, the income approach, and the cost approach. Fishman, "Valuation Termination and Methodology", in Financial Valuation:  Businesses and Business Interests par. 2.7 (Zukin ed. 1990).  Under the market comparison approach, the value of stock is determined by comparison to the stock of similar companies with publicly traded stock.  Id. at par. 2.8.  Under the income approach, the value of stock is equal to the present value of the company's future income stream.  Id. at par. 2.9.  Under the cost approach, the value of stock is equal to the fair market value of the company's assets less the total amount of liabilities.  Id. at par. 2.10.

We note that we are not bound by the methods or opinions of any of the experts who testify at trial, but may use their opinions to assist in determining the value of the subject property. Chiu v. Commissioner, 84 T.C. 722, 734 (1985); Estate of Campbell v. Commissioner, T.C. Memo. 1991-615.  One expert may be persuasive on a particular element of valuation, and another may be persuasive on another element.  Parker v. Commissioner, 86 T.C. 547, 562 (1986).  Thus, we may adopt some aspects

of an expert's testimony and reject others.  Helvering v. National Grocery Co., 304 U.S. 282 (1938).

Petitioners' expert, Mr. Robert Conklin of Ernst & Young, relied solely on the income approach in valuing the SWI stock.  Mr. Conklin did not use the market comparison approach because he believed that there were no sufficiently comparable companies in existence as of the valuation date.  He did not use the cost approach because he felt it "tends to minimize the value of assets and fails to consider intangibles such as goodwill."

Mr. Conklin utilized a "discounted cash flow analysis" to calculate the fair market value of SWI stock.  Under this analysis, the value of stock is equal to the present value of the cash flow the company is expected to generate in the future.  Mr. Conklin began his analysis by estimating SWI's net income for the 10-year period from 1990 to 1999, and what he described as a "terminal year".  He calculated this net income figure by estimating the total sales SWI could expect to generate from each store and multiplying by the number of stores SWI could be expected to operate each year.  Mr. Conklin assumed that SWI would expand its operations rapidly from 1989 to 1994, and that it would open a constant number of new stores each year thereafter until 1999, reaching a total of 271 stores in that year.  He also assumed that

newly opened stores would generate revenues of $25 million per year, while mature stores would generate $35 million.  Additionally, Mr. Conklin assumed that SWI's gross profit margin would grow by 0.3 percent each year, reaching an "industry norm" of 13 percent of sales by 1999 to reflect improved management and economies of scale.

Mr. Conklin next reduced SWI's estimated total sales by operating, pre-opening, capital, interest, tax, and other expenses to arrive at a projected net income for each year.  In calculating the amount of such expenses, Mr. Conklin assumed that beginning operating expenses for each store would equal 8.8 percent of net sales, and that this figure would decrease by 0.1 percent per year over a 9-year period (beginning the second year) to reach a minimum ratio of 8.0 percent.  He also assumed that each new store opening required capital expenditures of $1 million and pre-opening expenditures of $400,000.

Mr. Conklin next estimated SWI's "debt-free residual cash flow" for each year.  He calculated this figure by reducing net income by "incremental working capital", which he described as the amount of working capital required to support accounts receivables and inventory. Mr. Conklin assumed that this figure for each year would equal 7 percent of the increase in sales over the

previous year. He then added depreciation and deducted capital expenditures to reach a final "debt-free residual cash flow" for each year.

Next, Mr. Conklin reduced "debt-free residual cash flow" each year to present value, applying a discount rate of 35 percent. Mr. Conklin chose this discount rate after examining the risk inherent in SWI's financial structure and the risk associated with SWI's general business enterprise. According to Mr. Conklin, the discount rate reflects the rate of return an investor would require before devoting money to a particular enterprise, considering its particular economic, market, and industry risks. In this regard, Mr. Conklin examined the capital structure of the computer retailing industry, as well as the economic, market, and industry risk on the valuation date. He believed that SWI presented a particularly risky investment due to difficulties in obtaining financing for expansion and a high degree of risk in the computer and related markets. Additionally, Mr. Conklin believed that "The [discount] rates for venture capital funds averaged between 30 to 60 percent or more due to the business risk associated with SWI's position." He did not cite any authority for this conclusion either in his expert report or in his testimony at trial, nor did he state whether this rate of

- 29 -

return is generally required for venture capitalists or is specific to an investment in SWI. Mr. Conklin believed that a 35-percent rate of return was necessary not only to justify the high degree of risk involved in Dubin Clark's investment in SWI, but also to allow Dubin Clark to make an overall profit despite the failure of other ventures.

After calculating the present value of SWI's "debt-free residual cash flow" for each year, Mr. Conklin reduced the sum of these values by the book value of debt outstanding in 1989 to arrive at the "fair market value of equity, enterprise basis." Finally, Mr. Conklin divided this figure by the total number of shares outstanding to reach the price per share. Mr. Conklin computed this value assuming 6 percent, 7 percent, and 8 percent "terminal growth rates". This produced per share values of ($72.38), $100.14, and $285.43, respectively. Mr. Conklin then reduced these figures to reflect a "minority and marketability discount" of 50 percent, which he based on the Mergerstat Review 1989. This produced a range of values of ($36.19), $50.07, and $142.72 per share. Based on this range, Mr. Conklin concluded that the fair market value of SWI stock as of June 30, 1989, was $55 per share.

We find petitioners' expert's valuation unpersuasive. First, the results of Mr. Conklin's analysis fluctuate wildly with minor changes in basic assumptions. For example, minor changes in what Mr. Conklin terms "Incremental Working Capital" cause drastic changes in the overall value of the stock under his analysis. "Incremental Working Capital" is measured as a percentage of the increase in sales over the prior year. Throughout his analysis, Mr. Conklin assumed that SWI would require working capital each year equal to 7 percent of the increase in sales over the previous year. However, a change in this figure of just 1 percentage point to 6 percent, leaving all of Mr. Conklin's other assumptions unchanged and applying a 7-percent growth rate, causes the price per share to increase, by our calculation, to $1,748.17. This is troubling in light of the fact that Mr. Conklin agreed on cross-examination that 6 percent was a reasonable figure for incremental working capital. Given the importance of incremental working capital to Mr. Conklin's valuation model, and the volatile effect this figure has on his overall valuation, we find troubling Mr. Conklin's concession as to the reasonableness of using 6 percent. Moreover, we note that information contained in Mr. Conklin's report suggests that SWI's incremental working capital had

fluctuated between 1.7 percent and 7.58 percent during the 4-year period from 1986 to 1989.  Our computation of those percentages is as follows:

| In Thousands | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Total sales | $3,000 | $11,739 | $32,124 | $66,566 | $137,458 |
| Change from previous year | -- | 8,739 | 20,385 | 34,442 | 70,892 |
| Working capital | -- | 211 | 347 | 1,777 | 5,376 |
| Incremental working capital | -- | 2.41% | 1.70% | 5.16% | 7.58% |

The discount rate employed in Mr. Conklin's valuation model is also bothersome.  Mr. Conklin testified that he chose a discount rate of 35 percent to reflect the rate of return required by venture capitalists before devoting money to a particular enterprise.  Mr. Conklin testified that venture capitalists generally require between 30- and 60-percent return, and that his 35-percent discount rate was "conservative".  However, Mr. Conklin did not provide any objective support, either at trial or in his expert report, for selecting a discount rate in this range. Moreover, the discount rate is another extremely problematic variable in Mr. Conklin's model.  Changing the discount rate just 2 percentage points, from 35 to 33 percent, leaving all other variables the same and applying a 7-percent growth rate, causes an increase in the overall valuation from, by our calculation, $47.33 per share to $1,161 per share.  A discount rate of 30 percent produces a final value of $3,551 per share.  Once again, the

volatile nature of Mr. Conklin's valuation model, along with the lack of objective support for his assumptions, causes us concern about the accuracy of his final calculation.

We are also not persuaded by petitioners' argument that the $60.98 price per share established in the original acquisition transaction and used in connection with the Share Compensation Plan supports the accuracy of petitioners' expert's valuation. In consideration for their shares in old SWI, Dubin Clark gave Messrs. Jacobson and Henochowicz $5 million in cash, the right to contingent payments of 30 percent of the company's operating profit in excess of $4 million for the next 5 years, and the right to purchase approximately 27 percent of the stock of new SWI for $60.98 per share. We agree with respondent that this price per share does not accurately reflect the fair market value of the stock after the acquisition transaction. Indeed, as mentioned above, the $60.98 price for the new SWI shares was computed by dividing paid-in capital as of January 31, 1989, $439,056, by the number of shares of new SWI stock outstanding at that time, 7,200. It bears no necessary correlation to the value of the SWI stock after the acquisition transaction. Furthermore, there is no evidence that it was intended to reflect the value of the

new SWI stock after the transaction.  It was just one component of the overall acquisition transaction in which Dubin Clark acquired the interests of Messrs. Jacobson and Henochowicz in old SWI, and was not a separate arm's-length sale reflecting the fair market value of the specific block of stock.  Accordingly, the price established in the acquisition transaction does not necessarily reflect the fair market value of the stock at that time, or 6 months later when petitioner acquired the stock at issue.

Moreover, Dubin Clark established the Share Compensation Plan for the express purpose of attracting talented management to SWI.  One way to accomplish this purpose was to offer prospective managers a significant discount on the shares made available for purchase.  The language of the stock plan itself confirms that the board of directors contemplated selling stock at less than fair market value.  Paragraph 4(a) of the stock plan provides as follows:

> The purchase price for the shares of Common Stock to be offered and sold from time to time by the Company pursuant to this Plan shall be initially $60.98 per share and thereafter as determined from time to time by the Board.  The Board is authorized to offer and sell shares of Common Stock pursuant to this plan at less than fair market value in order to compensate qualified employees, directors, officers, consultants and advisers of the Company * * *

Thus, the language of the stock plan itself suggests that the initial purchase price of $60.98 per share was less than the fair market value of the stock at the time the stock plan was adopted.

Further, petitioner himself testified at trial that he believed the value of SWI increased at the moment he joined the company. Because petitioner purchased the subject stock after he officially joined the company, the value of the stock was, by his own admission, greater than it was at the time the $60.98 price per share was established. Thus, we find that the price of $60.98 per share established in the original acquisition transaction and the Share Compensation Plan does not provide an accurate measurement of the value of the stock.

Events occurring after the valuation date provide additional evidence that petitioner's stock in SWI was worth more than $60.98 per share on June 30, 1989. First, in a letter dated June 14, 1990, KPMG Peat Marwick valued a noncontrolling interest in SWI at $2,500 to $2,700 per share as of March 31, 1990, only 9 months after the valuation date. Second, in a confidential private placement memorandum, Goldman Sachs & Co. and Alex. Brown & Sons, Inc., determined this value to be approximately $15,000 per share as of October 1, 1990.

Finally, petitioner himself reported the value of the additional 25 shares of SWI stock he purchased on April 4, 1990, at $2,600 per share. Taking into account changes in general economic and other circumstances between June 30, 1989, and the dates of these subsequent valuations, we find respondent's valuation much more reasonable than petitioners'.

In light of the foregoing, we reject petitioners' expert's valuation in its entirety. Cf. Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980); see also Neely v. Commissioner, 85 T.C. 934, 944 (1985). Accordingly, we find that petitioners have failed to satisfy their burden of proving that respondent's determination of the fair market value of the subject stock is erroneous. See Rule 142(a). We thus accept respondent's determination in its entirety and find that the stock purchased by petitioner had a fair market value of $1,739.82 per share as of June 30, 1989.

Next, we must decide whether petitioners are liable for the accuracy-related penalty prescribed by section 6662. Respondent determined that petitioners are liable for the penalty with regard to the deficiencies attributable to both the SWI stock and an unrelated transaction involving stock in Home Depot, Inc. Although the amount of the deficiency arising from the transaction

in Home Depot stock was settled, the section 6662 penalty was not.

Section 6662 imposes a penalty equal to 20 percent of any portion of an underpayment of tax attributable to negligence or disregard of rules or regulations, or to a substantial understatement of income tax. Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). Disregard is defined as "any careless, reckless, or intentional disregard." Sec. 6662(c). Petitioners bear the burden of proving that respondent's determination of negligence or intentional disregard of rules or regulations is erroneous. Rule 142(a); Forseth v. Commissioner, 85 T.C. 127, 166 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. without published opinions sub nom. Woolridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986); affd. without published opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987); affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987).

With regard to the deficiency arising from the SWI stock, petitioners point to the fact that petitioner engaged in "extensive discussions" with Dubin Clark regarding his employment with SWI and his purchase of SWI

stock. Petitioners argue that through these discussions, petitioner made a reasonable effort to determine the value of SWI, and that he had no reason to expect that the stock was worth more than the $60.98 per share that he paid. Petitioners also argue that given petitioner's business experience and expertise, this determination was reasonable. We disagree.

Although petitioner is a successful businessman, he is neither an accountant nor an expert in property valuation. The record indicates that petitioners received professional assistance in preparing their tax return for the year in issue. However, there is nothing in the record to show that petitioners relied on expert advice in valuing the SWI stock, or that they provided the return preparer with all of the information needed to value the stock. Under the circumstances, we find that petitioners failed to do what a reasonable and ordinarily prudent person would have done under the circumstances to value the SWI stock. See generally Neely v. Commissioner, 85 T.C. 934, 947 (1985). Accordingly, we find that petitioners are liable for the penalty prescribed by section 6662 for negligence with respect to the SWI stock. Sec. 6662(b)(1). It is unnecessary to consider whether they are liable for the same penalty by reason of

a substantial understatement of tax with respect to the SWI stock.  See sec. 6662(b)(2).

Petitioners have not challenged respondent's determination of negligence with respect to the understatement attributable to the gains from a transaction involving Home Depot stock.  Although the Stipulation of Settled Issues states that petitioners concede underreporting the gain as determined in respondent's notice of deficiency, the stipulation is silent on the issue of the section 6662 penalty.  At trial, petitioners' counsel informed the Court that this issue had not been resolved.

Petitioners bear the burden of proving that they are not liable for the penalty as determined by respondent. Rule 142(a).  Petitioners have not met this burden with respect to the understatement attributable to the transaction involving Home Depot stock.  They introduced no evidence disputing the section 6662 penalty, and failed to raise any argument during trial or on brief as to why the penalty is inapplicable.  Accordingly, we sustain respondent's determination that petitioners are liable for the section 6662 penalty with respect to such understatement.

In light of the foregoing, and to reflect concessions and settled issues,

An appropriate order will be issued granting respondent's motion in limine in part, and denying respondent's motion in limine in part, and decision will be entered under Rule 155.